IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


MARLOW MORGAN                                                                    PLAINTIFF


v.                                        No. 4:04CV00374 GH


A. G. EDWARDS & SONS, INC.                                              DEFENDANT


## ORDER

Plaintiff filed a complaint on April 12, 2004, alleging age discrimination under the ADEA and deprivation of retirement and other benefits under ERISA due to termination of his employment. He seeks declaratory judgment, compensatory and punitive damages, penalties, injunctive relief, interest, and fees and costs.[1]

On August 30th, defendant filed a motion for summary judgment supported by brief, numerous exhibits, and a separate statement of undisputed facts.  It contends that plaintiff does not have any direct evidence of age discrimination, he cannot establish a prima facie case of age discrimination based on indirect evidence since he was not replaced by a substantially younger employee, and his termination did not deprive him of any benefits in his 401(k) monies – the only ERISA plan.

Plaintiff responded on September 26th with brief, exhibits filed under seal, and a response to the statement of facts.  On October 6th, defendant filed a reply supported by exhibits.  Plaintiff

---

[1]An amended complaint was filed on February 24th which only corrected a citation to the ERISA statute.

filed a sur-reply on October 7th. On October 11th, plaintiff filed a sealed supplement to his response. Defendant filed a sealed reply regarding that supplement on October 17th. On October 20th, defendant filed a sealed correction to its reply to plaintiff's supplement. Defendant filed, on October 21st, a request to attach an exhibit to that reply.[2]

The Court first notes that the May 3rd order continuing the trial from July 25th set the trial for the week of October 31st with jury instructions due on October 17th. The order further stated that "[a]ll remaining deadlines remain in effect." Those deadlines in the February 14th order extended the discovery cutoff to March 24th with discovery matter motions due on March 9th and all other motions due on March 24th.[3] Thus, the August 30th summary judgment motion was filed outside the deadline for the filing of such motion and could be denied on that basis. However, the Court is persuaded that the merits of the motion should be addressed.

Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2512 (1986). The non-moving party may not just rest upon his or her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986); Civil

---

[2]While plaintiff has filed a motion to compel, none of his filings contain an affidavit under Civil Procedure Rule 56(f) that additional discovery is needed to oppose the summary judgment motion and indeed no such argument was made.

[3]The parties did file a stipulation on August 11th regarding designation of their experts and that the depositions of the experts could take place after the discovery cutoff.

Procedure Rule 56.  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law."  Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir. 1989).

Local Rule 56.1 provides that a party moving for summary judgment must file a separate, short and concise statement of material facts as to which it contends there is no genuine issue to be tried.  The rule further provides that unless the non-moving party files a separate, short and concise statement of the material facts as to which it contends a genuine issue exists to be tried, all material facts set forth in the moving party's statement will be deemed admitted.

Defendant's Local Rule 56.1 statement follows with plaintiff's statement response contained in brackets:

1.      In 1971, Plaintiff began his employment with A.G. Edwards & Sons, Inc. (A.G. Edwards), an investment firm headquartered in St. Louis, Missouri.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 1.]

2.      Plaintiff worked first as a stockbroker and, in 1973, was appointed Branch Manager of A.G. Edwards' Monroe, Louisiana branch.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 2.]

3.      In August 1978, Plaintiff became a Regional Manager responsible for the Southern Region. On July 29, 2003, when A.G. Edwards relieved Plaintiff of the Regional Manager responsibilities, the Southern Region consisted on 52 branches in Louisiana, Arkansas, Mississippi, Tennessee and Kentucky.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 3.]

4.      As a Regional Manager, Plaintiff was responsible for supervising the Branch Managers in his region. His duties included but were not limited to opening new branches, recruiting new financial consultants and Branch Managers, overseeing compliance and legal issues affecting his region, and generally being responsible for the profitability of the branches under his direction. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 4.]

5.      Under Plaintiff's watch, the Southern Region's performance was average. [Plaintiff disputes the statements of fact contained in defendant's paragraph 5 and states that the Southern Region's "numbers were right in the middle of others." However, Mr. Morgan points out that "[f]rom a standpoint of profitability, you'll have to realize that some of the regions were much larger than my region.]

6.      For much of Plaintiff's employment with A.G. Edwards, Ben Edwards, the company's founder, served as its President and CEO. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 6.]

7.      In March 2001, Edwards stepped down from his position with the company and Robert Bagby was appointed CEO. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 7.]

8.      Prior to his being appointed CEO, Bagby had served the company as Director of Branches, Assistant Director of Branches, and a Regional Manager. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 8.]

9.      Bagby's elevation into the CEO position came at a time when the stock market industry was suffering and going through change. Beginning in 2000, the bull market came to an end and

the stock market started to see dramatic declines in stock prices.  After 9/11 the stock market

became even more volatile.  At about the same time, several huge corporations came under

investigation for corrupt business practices, resulting in significant losses for stockholders.

The industry as a whole came under greater scrutiny by regulators, and investment firms had

to devote more time and resources to compliance and legal issues.  [Plaintiff does not dispute

the statements of fact contained in defendant's paragraph 9.]

10.    As result of the decline in the overall market conditions, A.G. Edwards suffered a 74%

decline in profits for the 2001 fiscal year.  [Plaintiff does not dispute the statements of fact

contained in defendant's paragraph 10.]

11.    In response, in 2002 A.G. Edwards implemented a Reduction in Force.  [Plaintiff does not

dispute that the defendant implemented what it terms a "reduction in force."  The plan the

defendant issued was a "voluntary" severance plan ("VSIP").  The VSIP covered only AGE

employees who were at least fifty years old and who had worked for AGE for at least fifteen

years.  The VSIP informed recipients, including Mr. Morgan, that AGE "anticipate[d], that

A.G. Edwards will implement other initiatives, including involuntary reductions in

employment."]

12.    Bagby initiated measures to make employees more accountable than ever before.  Bagby's

focus on accountability went beyond compliance and legal issues as required under

Sarbanes-Oxley, and extended to the performance of employees.  [Plaintiff disputes the

statements contained in paragraph 12.  Mr. Bagby instituted changes in the structure of AGE

regarding compensation and related issues.  Mr. Morgan disputes that Mr. Bagby "initiated

measures to make employees more accountable than ever."]

13.     For the most or his tenure as a Regional Manager, Plaintiff prided himself on his "hands-off" management style. [Plaintiff does not dispute the statements of fact contained in defendant's Paragraph 13.]

14.     According to Plaintiff, his practice was to hire good managers and then let them run their branches.  [Plaintiff does not dispute the statements of fact contained in defendant's Paragraph 14.]

15.     Some Branch Managers enjoyed Plaintiff's style of management because it allowed then to operate their branches without outside interference.  Other Branch Mangers sought more feedback and input from Plaintiff, and found his style of management to be lacking. [Plaintiff disputes the statements of fact contained in defendant's paragraph 15.  The overwhelming majority of branch managers the plaintiff supervised throughout his tenure "enjoyed" his management style.  The defendant cites the testimony of two branch managers, one of whom, Doug Medley, has assumed Mr. Morgan's position on an interim basis.  The "fact" that a few branch managers – out of a total of 52 branches – may have "complained" is not a material fact.]

16.     Many of Plaintiff's Managers found it difficult to reach him by telephone when they needed him, leading them to conclude that Plaintiff was rarely in the office.  [Plaintiff disputes the defendant's contention that he was not available or that branch managers were unable to reach him.  At all times, plaintiff was accessible by telephone.  One of the defendant's witnesses, Emile Bizot, has testified that he was always able to reach Mr. Morgan.]

17.     At the same time, many of Plaintiff's Managers formed the impression that Plaintiff rarely visited his branches' offices.  [In response to paragraph 17, Mr. Morgan states that an

"impression" is not a statement of fact.  In any event, Mr. Morgan frequently visited his branches.  Mr. Morgan also states that it is undisputed that he was the Regional Manager for over 50 branches, covering five states – Arkansas, Louisiana, Mississippi, Tennessee, and Kentucky.]

18.    On more than one occasion, Plaintiff was instructed by his supervisors to visit his branches more frequently.  [Plaintiff disputes the statements contained in defendant's paragraph 18. The defendant cites no evidence in the record to support this statement as required by local rules.]

19.    In a February 20, 1983 letter from David Sister, Plaintiff's supervisor for a number of years, to Plaintiff, Sister expressed the following concern:

> I have a concern over the rest of the Region as it appears you have not even visited several locations during the year.  Many of your managers don't particularly need that attention – many of them do – A.G. Edwards does – I do.  I guess you have never worked for a Regional who helped you.

[Plaintiff does not dispute that a letter was written as described in defendant's paragraph 19. However, the letter was written over twenty years before plaintiff was terminated, by an individual who was no longer the plaintiff's supervisor at the time of his demotion and termination.  As a matter of law, this letter is not "material" to any issue of fact involved in this lawsuit.]

20.    In a March 1, 1989 letter to Plaintiff, Sister wrote, "your presence in the Monroe office is needed more and more – now.  I am not in the business of designing a Regional Officer's daily working hours, but of all 10 reporting to me, you appear to be 'out' more often by a considerable amount.  [Plaintiff does not dispute that a letter was written as described in defendant's paragraph 20.  However, this letter was written over fourteen years before the

plaintiff was terminated, by an individual who was not a supervisor of the plaintiff at the time of his demotion and termination. It is not material to any issue of fact involved in this lawsuit.]

21. Three years later, in a February 14, 1992 letter, Sister wrote to Plaintiff, "I still am not totally sure what you do between 8 and 5. Your production is down and you are a little tougher to contact than others." [Plaintiff does not dispute that a letter was written as described in defendant's paragraph 21. However, the letter was written over 11 years before the defendant terminated the plaintiff's employment. The letter was written by an individual who was not the plaintiff's supervisor at the time of his demotion and termination. The defendant cannot dispute that the record is void of any evidence that this former supervisor reduced the plaintiff's salary or bonus points, or took any other adverse action against the plaintiff other than placing a letter in his "permanent file." This letter is not material to any issue of fact involved in this lawsuit.]

22. From 1995 until 2001, Bagby served as Director of Branches and Plaintiff's supervisor. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 22.]

23. Although Bagby did not provide written evaluations on Plaintiff's performance, Bagby regularly discussed performance issues with Plaintiff. On several occasion, Bagby spoke to Plaintiff about his being out of the office so often and being inaccessible by telephone. On one such occasion, Plaintiff's explanation was that he was involved in the building of his home, a situation that lasted for a period of six months. [Plaintiff disputes the statements of fact contained in defendant's paragraph 23. The record reflects that Mr. Bagby spoke to the plaintiff on no more than one occasion regarding this issue, prior to his becoming CEO in

2001.  Mr. Morgan's testimony regarding the building of his home, which was less than four or five minutes from his office, speaks for itself.  It is certainly different than the defendant's characterization of it.]

24.  Sometime in 2003, Doug Medley and Doc Long, two Branch Managers who had worked for Plaintiff for many years spoke to Plaintiff about the fact that he needed to spend more time working with the branches.   [Plaintiff disputes the statements of fact contained in defendant's paragraph 24.  First, these individuals were not at any time supervisors of the plaintiff.  Second, both of their testimony is in the record, which reflects that neither had trouble reaching Mr. Morgan.]

25.  Doug Medley, who had worked for Plaintiff for 25 years, could see changes within the company after Ben Edwards retired and Bagby became President.  According to Medley, when Tad Edwards, Ben Edwards' son, was demoted from President and made Branch Manager, this signaled to him that changes were being made within the company and that employees would be held to a greater standard of accountability.  Anticipating that changes would be happening within the company, Medley believed that Plaintiff needed quickly to change his working habits.  As a result, Medley spoke to Plaintiff and advised him to visit the branches more frequently and provide more support for the newer Branch Managers.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 25.  Mr. Medley has never been a supervisor of the plaintiff and his "beliefs" regarding the plaintiff are not statements of material fact.]

26.  Doc Long, a longtime Branch Manager working under Plaintiff's supervision, also discussed with Plaintiff the need for Plaintiff to be more accessible and visible with Branch Managers.

[Plaintiff disputes the statements of fact contained in defendant's paragraph 26.  Mr. Long has never been a supervisor of the plaintiff.  Neither Mr. Long nor Mr. Medley has testified that they needed additional supervision.]

27.   Marty Altenberger, who held the position of Branch Administrator, was among those employed in St. Louis who had the greatest amount of contact with Plaintiff and the Branch Managers who worked for Plaintiff.  In his job as Branch Administrator, which he has held since 1995, Altenberger serves as the liaison between the home office and the branch offices in the Southern Region and the Southeast Region.  [Plaintiff disputes that Mr. Altenberger "had the greatest amount of contact with Plaintiff and the Branch Managers who worked for Plaintiff."  That is not Mr. Altenberger's testimony.  Plaintiff does not dispute the remaining statements of fact contained in defendant's paragraph 27.]

28.   During the time that Altenberger worked with Plaintiff's region, Altenberger experienced increasing levels of frustration with Plaintiff because of Plaintiff's lack of involvement with the Branch Managers in the Southern Region.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 28.  Plaintiff does not dispute that Mr. Altenberger testified regarding his "frustration."  However, Mr. Morgan disputes that Mr. Altenberger had any grounds for being "frustrated."]

29.   Altenberger regularly fielded questions from Branch Managers in Plaintiff's region about issues that Altenberger did not have authority to handle, such as compensation and hiring deals.  These were issues that Plaintiff, as Regional Manager, was responsible for addressing.  Often, Branch Managers in Plaintiff's region would call him seeking approval in hiring decisions because they could not get in touch with Plaintiff.  Many times, Branch Managers

would complain to Altenberger about the fact that Plaintiff was inaccessible and the fact that Plaintiff rarely visited their branch offices.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 29.  Mr. Altenberger's role in the company was that of a coordinator, which necessitated that both he and Mr. Morgan took certain calls and made certain decisions regarding hiring and compensation issues.  Mr. Morgan was accessible.]

30.     Altenberger spoke to Plaintiff about his work habits.  Altenberger informed Plaintiff that Branch Managers were complaining to him about the fact that Plaintiff did not visit the branches and he encouraged Plaintiff to visit the branches more regularly .  [Plaintiff disputes the statements of fact contained in defendant's paragraph 30.  This is not Mr. Altenberger's testimony.  He "may" have talked to the plaintiff regarding this issue on one occasion in 2000.   Moreover, Mr. Morgan was accessible and did visit his branches throughout his tenure.]

31.     When Altenberger spoke to Plaintiff about visiting the branches more frequently, Plaintiff's response was that he had been around long enough to earn the right not to visit the branches.  [Plaintiff does not dispute that this is Mr. Altenberger's testimony.  He does dispute that he ever spoke those words, and if he did, they would not have been in the context the defendant has placed them in.]

32.     On different occasions, Altenberger spoke to Plaintiff's supervisors about the complaints he was receiving from Plaintiff's Branch Managers.  He spoke both to Bob Bagby, when he was Director of Branches, and later to Rob Pietroburgo about Plaintiff's lack of accessibility.  [Plaintiff disputes the statements of fact confined in defendant's paragraph 32.  Mr. Morgan cannot dispute what Mr. Altenberger may or may not have told others regarding the plaintiff.

-11-

However, the plaintiff can and does dispute that he was unavailable or otherwise performed his job inadequately.]

33.   Altenberger also spoke to Pietroburgo about his frustration with spending an inordinate amount of time responding to issues raised by Plaintiff's Branch Managers, when those issues were ones that should have been directed to and resolved by Plaintiff.   [Plaintiff disputes the statements of fact contained in defendant's paragraph 33.  Mr. Altenberger's role in the company was that of a coordinator, which necessitated that both he and Mr. Morgan took certain calls and made certain decisions regarding hiring and compensation issues.]

34.   At different times, Pietroburgo was required to become involved in resolving problems in the Southern Region, which Pietroburgo believed could have been avoided or minimized had Plaintiff been more involved with his branches.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 34.  Mr. Altenberger's beliefs are not statement of fact. Moreover, Mr. Altenberger was the branch administrator, which required him to perform administrative duties.  He was the coordinator on certain issues in the Southern Region.]

35.   Beginning in March 2003, Pietroburgo began to express to Plaintiff his need to improve his performance and be more involved with his branches.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 35.  This is not an accurate statement of Mr. Morgan's testimony that the defendant has cited.]

36.   One of the problems about which Pietroburgo spoke to Plaintiff involved the branches in Lexington, Kentucky and Somerset, Kentucky.  [Plaintiff does not dispute that he had

conversations with various individuals, including Mr. Pietroburgo, regarding the Somerset and Lexington matters.]

37.     In the early part of 2003, A.G. Edwards had recruited two brokers from another firm to open a satellite branch for A.G. Edwards in Somerset.  Byron Holley, the Branch Manager for the Lexington branch, to whom Plaintiff had delegated a great amount of authority, had recruited the two brokers for the Somerset office.  [Plaintiff does not dispute that A.G. Edwards recruited two brokers from another firm in early 2003 to open a satellite branch in Somerset. There is no evidence that Mr. Holley was granted any amount of authority greater than any branch manager in the country.]

38.     Without authorization, Holley had promised the two new brokers that A.G. Edwards would pay all of their customers' transfer fees.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 38.  However, please see, Exhibit E, Morgan's Deposition, p. 95-96.]

39.     Shortly after recruiting these two brokers, Holley decided to move to Florida, and the two brokers found themselves having to deal with the home office concerning the transfer fees they had been promised.  (The company honored the agreement, which cost it a considerable sum of money.)  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 39, except that the testimony in the record does not state a "considerable" amount of money.  The statements in paragraph 39 do not even imply any wrongdoing on the part of the plaintiff.]

40.     Because the Somerset office was being set up as a satellite office, the Lexington office was to provide additional support.  Holley's departure left the Lexington office in a position of

not being able to provide this additional support.  Further, the computers that were installed in the Somerset office did not perform as they were expected, which caused technology problems in getting the office running.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 40.  He states that the defendant's paragraph 40 states no wrongdoing on his part or that any problems at the Somerset branch occurred through his action or inaction.]

41.     As different issues surfaced concerning the opening of the Somerset office, the two new brokers turned to Altenberger to express their mounting frustration in setting up their office. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 41, except the characterization of the brokers frustration.]

42.     At some point, the problems experienced in the opening of the Somerset office reached the desk of Pietroburgo, who called Plaintiff and instructed him to travel to Somerset immediately to address the problems and show support for the two brokers.  [Plaintiff does not dispute that he and Mr. Pietroburgo discussed the Somerset matter; however he does dispute the defendant's characterization of the cited testimony. That testimony speaks for itself.]

43.     Pietroburgo believed that had Plaintiff been more involved in the opening of the Somerset office, some of the problems and frustration of the two new brokers could have been avoided.  [Plaintiff disputes the statements contained in defendant's paragraph 43.  The statements in paragraph 43 are filled with speculation as to what could have or would have happened.  They contain Mr. Pietroburgo's belief, which are not statements of fact.]

44.     Pietroburgo also received complaints from the individual who had been named interim Branch Manager for the Lexington branch.  This individual was not happy that she had been named interim Branch Manager and was concerned about the length of time she would be required to serve as interim Manager.  Pietroburgo also addressed this issue with Plaintiff because he believed Plaintiff should have selected or hired a permanent Branch Manager prior to Holley's departure since Holley had given ample notice of his plans.  [Plaintiff states that Mr. Pietroburgo's "belief" is not a statement of material fact.]

45.     Pietroburgo believed that Plaintiff's failure to appoint a Branch Manager for Lexington in a more timely fashion was another indication that Plaintiff was not tending to his responsibilities as Regional Manager.  [Plaintiff states that Mr. Pietroburgo's "belief" is not a statement of material fact.; nor is his speculation about future events a statement of material fact.]

46.     On different occasions, Pietroburgo called Plaintiff and discussed with him the Somerset and Lexington issues, as well as other issues.  [Plaintiff does not dispute that he and Mr. Pietroburgo discussed the "Somerset and Lexington issue."]

47.     While none of these issues on their own were terminable offenses, Pietroburgo felt increasing frustration with Plaintiff.  The problems in Somerset, along with the complaints he was receiving from others, indicated to Pietroburgo that Plaintiff was not providing needed leadership in his region.  [Plaintiff does not dispute that the issues presented were not terminable offenses.  Plaintiff disputes all other [of] the statements of fact contained in defendant's paragraph 47.]

-15-

48.     On April 6, 2003, Plaintiff along with other Regional Managers attended a meeting in St. Louis concerning growing the regions.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 48.]

49.     During the course of this April 6, 2003 meeting, Morgan offered his opinion that the way headquarters charged branch offices for expenses inhibited growth.  Bagby, who was conducting the meeting, disagreed with Plaintiff's comment, and the two had a heated exchange of opinions.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 49 with the exception of disputing that the exchanges of opinion were heated.  There is nothing in the record to support this characterization.]

50.     Afterwards, several Regional Managers reported to Pietroburgo that they were embarrassed by Plaintiff's comments.  [Mr. Morgan cannot agree with or dispute the statement in paragraph 50 because the cited testimony does not reflect this statement.  To the extent the assertion in paragraph 50 is offered as an unsupported statement of fact, Mr. Morgan disputes it.]

51.     On July 24-26, 2003, Plaintiff held a regional meeting in New Orleans with his Branch Mangers and brokers.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 51.]

52.     Altenberger, who attended this meeting, did not see Plaintiff as being as well prepared as he needed to be.  [Plaintiff disputes Mr. Altenberger's opinion of the July, 2003 meeting in New Orleans.]

53.     Altenberger did not see Plaintiff at the meeting after the opening session. [Plaintiff does not dispute that Mr. Altenberger did not see the plaintiff after the opening session, but states that his practice was only to attend the opening session.]

54.     After Altenberger returned to St. Louis from the New Orleans meeting, Altenberger reported his observations to Pietroburgo. Altenberger also reported to Pietroburgo that several Branch Managers had commented to him about Plaintiff's absence from the meeting. [Plaintiff has no way to dispute whether Mr. Altenberger had conversations with Mr. Pietroburgo regarding the plaintiff. However, there is no evidence in the record of managers "complaining" to Mr. Altenberger regarding Mr. Morgan not attending the afternoon session of the meeting. It was Mr. Morgan's long-standing practice to only attend the morning session. There is no evidence in the record that Mr. Morgan had ever been asked to attend the afternoon session at the July, 2003 meeting or at any meeting held in the past.]

55.     After hearing about Plaintiff's conduct at the regional meeting, Pietroburgo concluded that Plaintiff should be removed from the Regional Manager position. [Plaintiff does not dispute that Mr. Pietroburgo decided to demote plaintiff following the July meeting in New Orleans. However, Mr. Pietroburgo has testified that, even of Mr. Altenberger's allegations were true, they were not firing offenses.]

56.     Pietroburgo's decision, however, was not based solely on Plaintiff's performance in New Orleans but was based on a number of reasons, including but not limited to Plaintiff's regular absence from the office, Plaintiff's poor work ethic and office attendance, the difficulty his Branch Managers had in contacting him for decisions, which resulted in his Branch Managers having to go directly to Altenberger, plaintiff's failure to visit branches regularly,

and the problems that had occurred in opening the Somerset, Kentucky branch. [Plaintiff disputes the statements of fact contained in defendant's paragraph 56. The defendant's stated reasons for demoting and terminating the plaintiff are a pretext for its true and unlawful reason. The evidence supporting this response is set forth in plaintiff's brief and is incorporated herein by reference. The defendant never formally reprimanded the plaintiff for any of the actions it cites in paragraph 56. The plaintiff regularly received raises and bonuses, which were tied to his merit as an employee.]

57.   Once Pietroburgo made the decision to remove Plaintiff as Regional Manager, Pietroburgo informed his superior, Bob Bagby, who concurred in the decision. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 57.]

58.   Plaintiff came to St. Louis on July 29, and Pietroburgo advised Plaintiff of the company's decision to remove him from the position of Regional Manager and place him in the position of financial consultant. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 58.]

59.   Pietroburgo advised Plaintiff that he would continue to draw for a period of a year the salary of Regional Manager to help him through the transition. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 59, but adds that he would have been required to sign a covenant not to compete in order to accept this offer, which would have precluded him from seeking employment from any competitor of AGE in any capacity.]

60.   After July 29, 2003, Plaintiff did not report to the Little Rock Branch Office and assume his responsibilities as a financial consultant. [Plaintiff disputes the statements of fact contained

in defendant's paragraph 60.  This statement is unsupported by citation to the record, as required by local rule.  See also response to paragraph 61.]

61.  As a result, on November 30, 2003, his employment with A.G. Edwards was terminated. [Plaintiff does not dispute that AGE terminated him on November 30, 2003.  He states, however, that he was terminated after he refused to sign a covenant not to compete.]

62.  In July 2003, when Plaintiff was relieved of his duties as Regional Manager, Plaintiff had the most tenure as a Regional Manager of the 13 Regional Managers located throughout the United States.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 62.]

63.  Plaintiff, at 59, was younger than four of the Regional Managers (Paul Coffee, 63, Charles Galli, 63; Donald Robinson, 61; and David Sprowl, 63), was less than five years older than two fo the Regional Managers (Louis Ginocchio, 55; William Mitchell, 54), and was older by more than five years than the six remaining Regional Managers.  Of these six, the youngest was Alex Bigelow, 43, and the oldest was Cecil Wright.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 63.]

64.  Plaintiff's replacement as Regional Manager for the Southern Region was Doug Medley, 63. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 64.]

65.  Two other candidates were considered for the position of Regional Manager.  They were Clyde French, who at the time was 57, and Doc Long, who was 61 years of age.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 65.]

66.  Clyde French was never officer the job as Regional Manager.  [For purposes of this motion only, plaintiff does not dispute the statements of fact contained in defendant's paragraph 66.]

67.     Medley committed to stay in the Regional Manager's position for at least three years, and currently has no plans to retire.  [Plaintiff disputes that, at the time he was put in the position of Regional Manager, Doug Medley intended to stay with the company for a period of three years.  It was well-known within the company that Mr. Medley was planning an imminent retirement.  Mr. Pietroburgo knew Mr. Medley was planning to retire before he placed him in Mr. Morgan's position in an effort to insulate the company from a lawsuit.]

68.     The Plaintiff does not have any direct evidence of discrimination.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 68.  The defendant had offered instituted [sic] a reduction in force targeted only to tenured employees over the age of 50, which included Mr. Morgan.  This "rif" did not in fact bring about a net layoff from the position of regional manager – in fact, at least one older regional manager was replaced by two individuals.  While the "rif" claimed to be voluntary, it included a specific warning that, if not enough older workers "volunteered" they could be subject to an involving [sic].  Moreover, Mr. Medley, while he is a "place-holder" put in his position because of the way he transitioned his branch to younger, "other" workers.]

69.     A.G. Edwards' payment of bonuses to employees, including Plaintiff, is not a benefit or pension plan covered by ERISA.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 69.]

70.     The A.G. Edwards Excess Profit Sharing Plan is unfunded and is not a plan covered by ERISA.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 70.]

71.     A.G. Edwards does not pay "residuals" to employees.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 71.]

72.     A.G. Edwards' Restricted Stock and Stock Options Plan is more akin to a bonus plan, and is not an ERISA plan.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 72.]

73.     A.G. Edwards' 401(k) plan is governed by ERISA.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 73.]

74.     Plaintiff was fully invested in A.G. Edwards' 401(k) plan.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 74.]

75.     Plaintiff did not lose or forfeit any benefits in the 401(k) plan when he was terminated.  [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 75.]

76.     Plaintiff's termination from A.G. Edwards did not keep him from attaining any rights to which he was entitled.  [Plaintiff disputes the statements of fact contained in defendant's paragraph 76.  Plaintiff's termination caused him considerable monetary and other damages as set forth in his amended complaint.]

77.     On January 7, 2004, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission in which he alleged that his demotion and termination were because of his age. [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 77.]

78.     On April 12, 24004, Plaintiff filed suit in federal district court alleging violation of the ADEA and ERISA.   [Plaintiff does not dispute the statements of fact contained in defendant's paragraph 78.]

        Based on its Local Rule 56.1 statement, defendant argues that plaintiff has not identified any conduct or statements that can constitute direct evidence of age discrimination and that he cannot

establish a prima facie case because he was not replaced by someone substantially younger than he was as plaintiff was 59 when he was replaced by Doug Medley who was 63 years of age. To plaintiff's contention that the offer was first made to a substantially younger man and then withdrawn before being offered to Medley who, while older than plaintiff, had expressed an intent to reduce his workload and become a salaried branch manger for a relatively short time before retiring thus becoming a temporary replacement to avoid an age discrimination claim, defendant counters that only two candidates other than Medley were considered – Clyde French who was 57 and Doc Long who was 61– and while French was interviewed he was not offered the job and was the third choice. Defendant continues that, even if French had been offered the job, the age difference was not substantial and that Medley is still serving as Regional Manager and has no current plans to retire. It also points out that four other Regional Managers were older than plaintiff so that an inference cannot be drawn that defendant was ridding itself of its older Regional Managers when plaintiff was relieved of his duties.

Turning to the ERISA claim, defendant asserts that neither the bonuses, residuals nor excess profit distributions are considered "plans" subject to ERISA and that while the 401(k) plan is an ERISA plan, plaintiff's termination did not deprive him of any benefit except his ability to make future contributions into the plan as he was fully vested and entitled to receive all of his contributions upon his termination.

Plaintiff has responded that plaintiff's performance as Southern Regional Manager was consistently at or above that of the other twelve regional managers, but that when Robert Bagby was promoted to CEO in 2001, he initiated a strategy to create a younger workforce resulting in plaintiff being demoted without any warning or counseling which was not consistent with defendant's policy.

He continues that he did not maintain the book of business as a regional manager that he had earlier in his career when he was employed as a stockbroker and so defendant understood that plaintiff would be unlikely to make a living as a stockbroker; that he was told when he was demoted that he would receive the bonuses and other deferred compensation that he had earned only if he signed a three-year non compete agreement; that he was the most senior of the thirteen regional managers, no employee younger than him had ever had an adverse action for "spending too much time with family," and he had not lost the confidence of the branch managers and stockbrokers he supervised, and that defendant's executives knew Medley was on the verge of retiring.

Plaintiff states that he has direct evidence by defendant's agents admitting that the company was weeding out older employees and transitioning to younger persons, that some employees felt they were being forced out of the company due to their ages; that the Voluntary Severance Incentive Program (VSIP) was only offered to employees over the age of fifty who had to sign a release to not sue for age discrimination and were threatened with involuntary termination if they did not accept, that there was no an actual reduction in force as two regional managers that accepted the offer were replaced by three younger individuals, and the person who demoted plaintiff stated in his deposition that Medley was "getting younger individuals – I shouldn't say younger."

As to a prima facie case, plaintiff states that he was 59 years old when he was demoted, he was performing his job at a level meeting legitimate expectations as demonstrated by the many letters received from employees expressing dismay when learning of the demotion, Pietroburgo was unable to articulate what precise conduct resulted in the demotion without notification that his job was in jeopardy due to poor performance, the demotion was tantamount to termination as his chance of succeeding as a financial consultant was low and he was asked to sign a covenant not to compete

in that position even though no current employee had ever been required to sign such a document, and it was well known that Medley was planning on retirement.  He continues that defendant's contention that his demotion was due to him being out of his of office frequently, hard to reach, and failed to visit the branch offices often enough is pretextual since plaintiff's management style did not change over the years; he received 92 bonus points out of 100 at the time of his demotion; the persons responsible for plaintiff's demotion and the replacement with Medley attempted to conceal their knowledge of Medley's retirement plans.

As to his claims arising under ERISA, plaintiff asserts that although the Deferred Compensation Plan is unfunded, defendant has offered no evidence that the Plan is offered to a highly-paid, select group of employees which must be done before the ERISA exemption applies and the stock option plan has a special rule for employees over the age of 57 and younger than 60 so his restricted stock will continue to vest thus giving older employees benefits they would not otherwise receive following retirement or termination of employment.

In its reply, defendant counters that the only agents that plaintiff relies upon as admitting that older employees were being weeded out are Emile Bizot – a non-management employee – and himself.  It further explains that Bizot's opinion was expressed in the context of his impression about the voluntary severance plan which he admitted that he knew little about.  As to plaintiff's testimony, defendant states that plaintiff could only attribute one comment made by Pietroburgo indicating that they were turning to younger management with the remainder being "scuttlebutt" that he could not identify with any specific person.  Defendant addresses the Pietroburgo comment as being made in his deposition taken almost two years after the demotion about how he knew that Medley was becoming a salaried branch manager and he responded: "It was pretty clear to me

[Medley] was transitioning the branch. He was getting younger individuals – I shouldn't say younger. He was getting other individuals involvement with management." Defendant states that Pietroburgo's statement was an observation from the facts known since the odds were that Medley's son and the other two individuals involved – who Medley estimated in his deposition were 48 years old – were younger than the 63-year old Medley. As to the written direct evidence, defendant asserts that it is based on the early 2002 voluntary retirement plan and that the Older Workers Benefits Protection Act, which is part of the ADEA, authorizes employers to use voluntary early retirement plans as a workforce reduction tool which was necessitated here by defendant suffering a 74% decline in profits for the 2001 fiscal year. It continues that plaintiff has not challenged the plan except for the fact that it was offered to employees 50 years or older; that plans that have been found violative of the ADEA have favored younger employers or reduced benefits to employees as they got older which are not found here; that even Bizot's testimony was that the only people that he knew that were affected by the plan were older and longer-tenured employees; and that the plan was offered in February 2002 more than a year before plaintiff was relived of his regional manager responsibilities, more than 18 months before his termination and more than 20 months before his EEOC charge in December 2003 that did not challenge the validity of the plan so that he is time-barred from challenging the validity of the plan.

As to a prima facie case by circumstantial evidence, defendant counters plaintiff's assertion that he can establish a prima facie case by demonstrating that his employer temporarily placed an older worker in his position to insulate itself from ADEA liability by pointing out that the Eighth Circuit has not adopted that view and there is no other evidence to show that the demotion was motivated by age since the company's new president was older than plaintiff , there is no evidence

that any top executives or any other older workers were forced out and replaced by younger employees, that the retiring regional managers since 2000 were over the age of 65, and – at the time of plaintiff's demotion – four of the thirteen regional managers were older than plaintiff and two were about the same age.  It continues that while people may have speculated that Medley had retirement plans, Medley testified that he never told Bagby or Pietroburgo when he was interviewed for the position that he had plans to retire – only telling them that he could only commit to the job for a few years but that he might be around, if his health permitted, for another five or ten years. Regarding plaintiff's attempt to present other evidence from which an inference of age can be drawn, defendant states that while there were certain branch managers and financial consultants who liked his hands-off management style, it is uncontroverted that other branch mangers were unhappy with plaintiff as was Pietroburgo about the lack of involvement with his branches.  To the argument that he was demoted contrary to policy, defendant states that policy was discussed with branch managers only days before the demotion and related to actions branch managers should take against employees under their supervision and was not applicable to senior managers or branch mangers.  Defendant further points out that plaintiff cannot identify another individual who received a severance agreement that did not contain a non-compete clause and that he was terminated when he failed to assume the duties of a financial consultant after his demotion and cannot point to anyone who refused to report to work for four months that was not terminated.

Pointing out that plaintiff concedes that the excess profit sharing plan is unfunded, defendant argues that its plan was not a "Top Hat" plan as it is offered in conjunction with a qualified retirement plan that imposes contribution limitations and so is exempt from ERISA under 29 U.S.C. §§ 1002(36) and 1003(b)(5).  It addresses plaintiff's assertion that the restricted stock and stock

-26-

option plan provides a special rule for employees over the age of 57 and younger than 60 by countering that such a rule does not establish that the plan was designed to systematically defer income for retirement as it makes a forfeiture exception for employees older than 57 and younger than 60 who retire or are terminated for reasons other than aggravated cause and does not necessarily forfeit unvested restricted stock provided they do not engage in competition with defendant during the restricted period so that plaintiff's termination of employment did not result in loss of any stock, but his loss of the unvested restricted stock was caused by plaintiff's decision to work for a competitor while he did not lose any right to the vested stock by either the termination or working for a competitor. The plan provides that employees can redeem their stock at any time after their three-year restriction passes and can redeem prior to termination or retirement without any penalties.

Plaintiff, in its surreply,[4] argues that the severance plan offered singled out older workers over the age of 50, was coercive as it was a reduction in force plan and that employees who were eligible but did not choose to participate could be considered along with other employees for any involuntary reductions, and reduced employee benefits based on age. He also argues that three younger executives in their forties that were demoted were treated differently as far as prior notice of their deficient performance, received better positions than plaintiff upon demotion and did not have to sign non-compete agreements to continue working with the company although plaintiff was.

Defendant responds that the three individuals were at different levels of management, two of the demotions were made by different people so they are not similarly situated to plaintiff, and plaintiff admitted that Pietroburgo had talked to him about issues with his management style before the demotion. It continues that plaintiff never alleged in his EEOC charge or complaint that these

---

[4]As this was filed under seal, the argument will be discussed in general terms.

three were treated differently in being demoted and that there is no evidence that plaintiff was asked to sign a non-compete to stay as a financial consultant as the matter of a non-compete was only discussed in the context of after plaintiff initiated discussions of a severance package rather than accepting the demotion.

Two years ago, the Eighth Circuit discussed direct and circumstantial evidence in <u>Griffith v. City of Des Moines</u>, 387 F.3d 733, 736 (8th Cir. 2004) as illustrated below:

> We have long recognized and followed this principle in applying <u>McDonnell Douglas</u> by holding that a plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. <u>Thomas v. First Nat'l Bank of Wynne</u>, 111 F.3d 64, 66 (8th Cir. 1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part <u>McDonnell Douglas</u> analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the <u>McDonnell Douglas</u> analysis, including sufficient evidence of pretext. See, <u>e.g.</u>, <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 971 (8th Cir. 1994).

The case of <u>Haas v. Kelly Services, Inc.</u>, 409 F.3d 1030, 1035 (8th Cir. 2005) sets out the factors to establish a prima facie case:

> The familiar <u>McDonnell Douglas</u> three-part burden-shifting framework requires that Haas establish a prima facie case of age discrimination. Specifically, Haas must show that:(1) she was at least 40 years old, (2) she was [demoted], (3) she was meeting Kelly's reasonable expectations at the time of her termination, and (4) she was replaced by someone substantially younger. See <u>Mayer</u>, 318 F.3d at 807 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. 1817).

The Court starts with the items advanced by plaintiff as demonstrating direct evidence of discrimination. First, the Court agrees with defendant that the testimony of non-management Bizot

based on his opinion about the voluntary severance plan about which he admittedly knew little about and plaintiff's testimony of "scuttlebutt" without identification of the participants fall far short of establishing the specific link of direct evidence as explained by the appellate court.

The Court next addresses what plaintiff believes to be the "smoking gun" – the February 28, 2005 deposition testimony of Pietroburgo.  The following excerpt is found at pages 82 through 85:

Q:      When did you make your list of possible successors to Mr. Morgan?

A:      That day.  That – that –

Q:      July 29th –

A:      Yes.

Q:      – 2003?

A:      Yes.

Q:      Now, you called Doc Long right after you took the adverse employment action with regard to Mr. Morgan, and you found him on his new boat?

A.      Doug Medley.

Q:      Excuse me, Do – Doug Medley was on his new boat.

A:      Yes.

Q:      What – what was his situation in his branch?

A:      He had – he had just become a salaried branch manager.  He had been a producer for – for his career but had just become a salary branch manager.  It was pretty clear to me he was transitioning the branch.  He was getting younger individuals – I shouldn't say younger.  He was getting other individuals involved in management.  My sense was that Doug was – he

was – he was getting other managers up to speed on the issues.  He was turning over the management responsibilities day-to-day.

Q:     Why?  Do you know?

A:     No, I don't.

Q:     You don't know why he was turning over more of the management responsibilities day-to-day and you said he was transitioning the branch?

A:     Well, I think its' – we've had – as the management responsibilities have become much greater over the last four – four or five years, we've had a natural shift of responsibilities form the branch manager to assistant, so that's not uncommon to have more management shared amongst a management team, so I – I was not aware that Doug was planning anything else other than getting other individuals involved in that branch.

Q:     How old was he?

A:     How old was Doug?

Q:     Yes.

A:     62, 63 years old.

Q:     Does – does he have a son in the branch?

A:     I believe he does.

Q:     Do you know that he turned over his commissions over to his son?

A:     I was not aware of that, but that's not uncommon.

Q:     Do you know that he wanted to retire?

A:     I was not aware of that.  If I knew that he was about to retire, I probably would have had another conversation about why are we putting him on salary.

-30-

Q:     Did he tell you that he was looking forward to retirement?

A:     No.  No.

Q:     Did you learn that from any source?

A:     I was not aware that he was considering retirement.  I knew that he was enjoying his boat,
       and I was envious.  It sounds like he's got a neat boat, but I was not ever advised that he was
       preparing for retirement any time immediately.

While Pietroburgo does use the word "younger"in his deposition, he was describing what he perceived Medley – who was indeed the oldest in his office in terms of age and tenure – as doing in Medley's own office.  Medley, of course, was not involved with the decision to demote plaintiff. Thus, the Court cannot find that Pietroburgo's description years later of actions taken by another person in another situation rises to the level of the required "specific link"of Pietroburgo's animus towards plaintiff in the demotion decision.[5]

The Court now turns to whether the voluntary retirement plan constitutes direct evidence. As the Eighth Circuit has utilized the case of <u>Auerbach v. Board of Educ. of the Harborfields Cent. School Dist. of Greenlawn</u>, 136 F.3d 104 , 112-114 (2nd Cir. 1998), in assessing whether a plan is authorized under OWBPA, that analysis is set out below:

> Whether such a plan "furthers the purposes of the Act" is ultimately an inquiry to be made
> on a case-by-case basis, taking into account all of the relevant facts and circumstances.
> SeeS.Rep. No. 101-263, at 28 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1533.  A court
> examining the validity of these plans should consider whether the plan (1) is truly voluntary,
> (2) is made available for a reasonable period of time, and (3) does not arbitrarily discriminate
> on the basis of age.  See <u>id.</u>  For the following reasons, we conclude that the subject

---

[5]"Direct evidence of employment discrimination must be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.  <u>Clearwater v. Indep. Sch. Dist. No. 166</u>, 231 F3d 1122, 1126 (8th Cir. 2000)."  <u>Quick v. Wal-Mart Stores, Inc.</u>, 04-3996 at p. 4 (8th Cir. March 24, 2006).

retirement plan set forth in the collective bargaining agreement entered into by the defendant Union and the defendant School District furthers the purposes of the ADEA.

1. Voluntariness.  To determine whether a retirement plan is voluntary, a court must consider whether, under the circumstances, a reasonable person would have concluded that there was no choice but to accept the offer.  See Paolillo v. Dresser Indus., Inc., 821 F.2d 81, 84 (2nd Cir. 1987) (giving employees only one weekend to accept early retirement raises question whether acceptance of plan is voluntary).  The present early retirement plan provides older teachers with an uncoerced, free choice.  No teacher is required to accept the plan. Moreover, the record shows that neither fraud, threats of imminent layoffs, intimidation nor subtle coercion are present.  Instead, teachers receive complete and accurate information regarding the benefits available to them under the plan.  Those who elect not to retire in the optimum year continue to teach and receive all of the benefits of the collective bargaining agreement, including annual salary increases.  Hence, the plan meets Congress' test of voluntariness.

2. Reasonable Period of Time.  Employees must be given a reasonable amount of time to consider their options and make an informed choice.  We conclude that the plan provides eligible teachers with sufficient time to make their decision.  Under the plan, qualifying teachers must submit to the School District a letter of resignation no later than January 1 of their final full year of service.  This requirement gives teachers approximately four months from the time their optimum school year begins (i.e., in September) to reflect and weigh their options.  Under these circumstances, the district court correctly held that the retirement plan provides a reasonable amount of time for teachers to consider their options.

3. No Arbitrary Discrimination.  The final question we must address is whether the plan arbitrarily discriminates on the basis of age.  Despite curtailing the Supreme Court's prior broad approval of employee benefit plans through passage of the Older Workers' Protection Act, Congress envisioned the proliferation of early retirement incentive plans akin to the plan at issue.  Both Houses expressly endorsed plans containing a time-related window during which employees, upon attaining a specified age, are offered for a limited period of time a special incentive to retire.  See 136 Cong.Rec. 27061 (1990) (House record); 135 Cong.Rec. 25353 (1990) (Senate record); see also S.Rep. No. 101-263, at 28 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1533-34.  Those special incentives may include both flat dollar amounts and service-based benefits (i.e., accumulated sick pay).  See S.Rep. No. 101-263, at 28 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1533.  Holding that such plans were consistent with the stated purpose of the ADEA, a Senate Report acknowledged that they "may help employers and workers meet problems arising from the impact of age on employment····" Id.

The retirement plan in the case at hand is precisely the sort of early retirement incentive plan that Congress aimed to preserve as lawful when it passed the Older Workers' Protection Act. 136 Cong.Rec. 27061 (1990) (House record) ("early retirement incentives that provide a flat dollar amount ··· [to] employees who have attained age 55 and who retire during a specified

window period ⋯ would be lawful"); 136 Cong.Rec. 25353 (1990) (Senate record) (same). The plan grants every teacher the opportunity to receive a $12,500 cash payment and an accumulated sick leave payment once he or she reaches the age of 55 and has served the requisite number of years. Teachers who decline to participate in the plan and receive its benefits continue to work as valued employees in the School District without any corresponding loss of benefits or job status.

The Harborfields Plan is easily distinguished from the plan considered by the Seventh Circuit in Karlen v. City Colleges of Chicago, 837 F.2d 314 (7th Cir. 1988), on  which plaintiffs rely. The plaintiffs in Karlen attacked a retirement plan that offered retirees a lump sum payment based upon a variable percentage of their accumulated sick pay, depending upon their age at the time of retirement.  This percentage rose from 50 percent at age 55 to 80 percent at age 64, but fell to 45 percent after age 64.  See id. at 316.

The Karlen plan arbitrarily discriminated on the basis of age among those within the group eligible for early retirement benefits.  See Cipriano v. Board of Educ. of North Tonawanda, 700 F.Supp. 1199, 1210-11 (W.D. N.Y. 1988), vacated on other grounds,772 F.Supp. 1346 (W.D. N.Y. 1991), aff'd,968 F.2d 1502 (2nd Cir. 1992).  The incentives gradually increased between ages 55 and 64, but dropped off precipitously for those participants who retired after age 64.  As a result, some plan participants received greater incentives than others solely because they retired at a more optimal age under the plan.  The employer offered no reason other than age for this downward sliding scale of incentive benefits.

An early retirement incentive plan that withholds or reduces benefits to older retiree plan participants, while continuing to make them available to younger retiree plan participants so as to encourage premature departure from employment by older workers conflicts with the ADEA's stated purpose to prohibit arbitrary age discrimination in employment.  SeeS.Rep. No. 101-263, at 27 (1990), reprinted in 1990 U.S.C.C.A.N. 1509, 1533; see also Karlen, 837 F.2d at 320 ("To withhold benefits from older persons in order to induce them to retire seems precisely the form of discrimination at which the Age Discrimination in Employment Act is aimed.").  The terms of a plan cannot discriminate among participants on the basis of age.

In contrast, the present plan does not provide for an age-based phase out of a lump sum incentive payment.  The plan pays out two lump sum amounts-one of which is dependent on the employee's sick leave record-to every teacher who retires during the incentive window. By offering the same incentives (subject to variations in accumulated sick days) to all plan participants who reach the age of 55, it treats those participants equally, regardless of the actual age at which they retire.  It is true that some older retirees who do not participate in the plan will not receive its benefits. However, their loss of plan benefits is due to their election to refrain from exercising their early retirement option during the relevant window of opportunity (which was the same length of time for all eligible employees), and not because they participated in the plan, yet retired at a later age.  Consequently, the subject retirement incentive plan does not arbitrarily discriminate on the basis of age among early

-33-

retirees who choose this option because it does not diminish benefits as the age of its participants increases.  It therefore satisfies the overriding purpose of the ADEA that a plan not discriminate on account of an employee's age.

The Eighth Circuit applied <u>Auerbach</u>'s reasoning in <u>Jankovitz v. Des Moines Independent Community School Dist.</u>, 421 F.3d 649, 654 655 (8th Cir. 2005):

> Moreover, contrary to defendant's argument, Auerbach does not support the conclusion that the amended ERIP is consistent with the purposes of the ADEA.  Defendant's amended ERIP materially differs from the early retirement incentive plan that was at issue Auerbach.  In Auerbach, eligibility for early retirement benefits was not based solely upon age, but also depended upon specific service requirements.  Under the early retirement incentive plan in Auerbach, a participating teacher must actually retire at the conclusion of the year in which he or she first becomes eligible to retire (the optimum year) in order to secure the $12,500 fixed sum payment and the accumulated sick leave payment (together, the retirement incentive benefits).  Teachers older than 55, but who have not yet fulfilled the service requirements, must retire in the year they complete the service requirements, regardless of their actual age, to receive the retirement incentive benefits.  Conversely, a teacher who has already completed the service requirements by the time he or she reaches age 55 must retire at the conclusion of the school year during which he or she becomes 55 in order to obtain these benefits.  Otherwise, the benefits are forever lost.  136 F.3d at 107-08 (emphasis added).

> In other words, while the early retirement incentive plan at issue in Auerbach did involve a "time-related window," it did not have as its upper limit a fixed age.  By contrast, in the present case, the upper limit of eligibility under defendant's amended ERIP is the fixed age of 65.

The Voluntary Severance Incentive Program offered by defendant on February 26, 2002 to certain non-branch employees fifty years or older with at least fifteen years of service mentions "voluntary" and "voluntarily" numerous times as do the forms; it states that "A.G. Edwards wants to make it clear that it is not pressuring you or any employee to elect the Voluntary Program and terminate your employment with A.G. Edwards.  Whether you terminate your employment with A.G. Edwards and elect to accept the compensation and other benefits is entirely up to you;" eligible persons had 45 calendar days to decide whether to elect to terminate employment under the terms of the program; to elect termination under the program, an agreement and release had to be signed

and returned to the Human Resource Department; failure to return the Agreement and Release was

an election not to terminate under the program; the employees had seven days after execution of the

Agreement and Release to revoke acceptance; if defendant did not allow an employee to participate

in the program, that fact would not be used in any decision regarding employment at defendant; and

also –

> The Voluntary Program will help A.G. Edwards achieve the required cost reductions while rewarding some of the firm's most long-term employees.  We anticipate, however, that A.G. Edwards will implement other initiatives, including involuntary reductions in employment. The decision concerning involuntary reductions has not yet been made and could be affected by the number of employees who participate in the Voluntary Program.  Employees eligible for, but who choose not to participate in, the Voluntary Program along with other employees may be considered for any involuntary reductions.

Applying the Auerbach factor, the plan meets the test for voluntariness, a reasonable amount

of time to make the election and to revoke, and no arbitrary discrimination as the provisions apply

equally to eligible employees 50 and over with 15 years service with no fixed age upper limit.

Moreover, while plaintiff challenges whether there was an actual reduction in force, the plan speaks

in terms of cost reduction, not necessarily a reduction in force.  Thus, the plan is similar to the one

approved in Auerbach and not to the one in Jankovitz.

Turning to the McDonnell Douglas analysis, the Court agrees with defendant that plaintiff

has not established a prima facie case of age discrimination as he was not replaced by someone

substantially younger.  It is uncontroverted that Medley was four years older than plaintiff and while

there was speculation that Medley would be retiring soon, there is no evidence that Medley planned

to do so or had definitely told Pietroburgo of that plan.  In his April 19, 2005 deposition, Medley

testified at page 44:

Q:      I will – I'll read it to you, and you can read it.  Doug Medley, when he expressed an interest

in this job, he said that he could not do it for a long period of time; that it would be two,

three, four years.  He acknowledged – I don't remember if he specified a period of time –

but he acknowledged that he did not want to take this position for a long period of time.

A:      What I – the statement I made to them was, I said – I said, I don't – I said, I know you guys

know how old I am.  Just life expectancy says that you're not offering it to a flat belly.  I

think I used that word.  You're not talking to a flat belly, so don't think you're getting a

regional that's going to be here for twenty years.  Do you follow me?  That was what I was

trying to get across to them, and what I'll say to you.  I'm sixty-three years old a the time.

You're not talking to somebody that can take this job and keep it for fifteen or twenty years.

I said, if – I can assure you that I'll stay here for at least three years, if my health holds up.

I may stay five or ten years.

As neither side has filed any supplement advising the Court that Medley's status has

changed, he is apparently still working as the regional manager going on three years after his

selection.

Although plaintiff argues that he was demoted so that he would fail and then could be

terminated.  However, the evidence shows that after his demotion, plaintiff made inquiry about a

severance package, but the several-week negotiations were unsuccessful.  Plaintiff was terminated

four months after his demotion when he continued to fail to report for work.  He has not identified

any younger employee who was not terminated when he or she failed to report to work.

In sum, defendant is entitled to summary judgment on the age discrimination claim.

The remaining claim concerns whether plaintiff was terminated to interfere with the attainment of rights under ERISA.  In the summary judgment motion, defendant addressed all the plans asserted by plaintiff in the complaint; however, as plaintiff has only argued about the deferred compensation and stock option plans in his response, the Court finds that those are the only two still at issue.

The parties agree as to the analysis to be applied to this claim as illustrated by Eckelkamp v. Beste, 315 F.3d 863, 871 (8th Cir. 2002):

> The district court also granted summary judgment on Count III, Kampmann's claim for retaliatory discharge under 29 U.S.C. § 1140 (ERISA § 510).  Section 510 provides that an employee cannot be discharged for "exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."  Claims under § 510 are analyzed under a burden shifting procedure like that in discrimination cases.  See Kinkead v. Southwestern Bell Telephone Co., 49 F.3d 454, 456 (8th Cir. 1995).  First, the claimant must establish a prima facie case by showing a causal connection between "participation in a statutorily protected activity and an adverse employment action."  Id.  If a prima facie case is shown under § 510, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action.  If the employer does so, the burden shifts back to the claimant to prove that the proffered reason is pretextual."  Id.

However, as defendant contends that the plans at issue are not part of an ERISA plan, the Court must first determine whether these plans are subject to ERISA.  Defendant argues that the excess profit sharing plan is not an ERISA plan pursuant to the ERISA exclusion from coverage of unfunded excess benefits plans because the plan here clearly and unambiguously states that it is unfunded with the benefits paid out of general assets.  Plaintiff counters that while defendant has established one half of the exemption as to the plan being unfunded, there is no evidence in the record that it was only offered to a select group of highly compensated employees.  Defendant has

responded that the requirement of a select group involves "top hat" plans which this is not since it is offered in conjunction with a qualified retirement plan that imposes contributions limitations.

29 U.S.C. § 1002(36) provides:

The term "excess benefit plan" means a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 on plans to which that section applies without regard to whether the plan is funded. To the extent that a separable part of a plan (as determined by the Secretary of Labor) maintained by an employer is maintained for such purpose, that part shall be treated as a separate plan which is an excess benefit plan.

29 U.S.C.A. § 1003(b) provides in part that "[t]he provisions of this subchapter shall not apply to any employee benefit plan if – ... (5) such plan is an excess benefit plan (as defined in section 1002(36) of this title) and is unfunded.

Defendant's excess profit sharing plan provides in relevant part:

The purpose of the Plan is to provide unfunded deferred compensation to certain highly compensated employees whose benefit under the A.G. Edwards, Inc. Retirement and Profit Sharing Plan (the "Profit Sharing Plan") is limited by the Allocation Limitations contained in the Profit Sharing Plan. For purposes of this Plan, "Allocation Limitations" means the limitations on benefits in the profit Sharing Plan imposed by Section 402(g) of the Code, which limits the amount an employee may elect to contribute to the profit Sharing Plan, as described in Article VI of the profit Sharing Plan, the limitation on the amount of Compensation which may be considered under the Profit Sharing Plan, as described in Article III of the Profit Sharing Plan, and the limitation imposed by Section 415 of the Code, which limits the amount that may be allocated to the account of an employee, as described in Section 7.6 of the Profit Sharing Plan.

Thus, defendant's excess profit sharing plan is exempt from ERISA under the pertinent statutory provisions.

Defendant asserts that the stock options plans are not covered by ERISA since the plan document clearly states that it is not an ERISA plan and its purpose is to provide additional incentive compensation subject to a three-year restriction at which time the employee is fully vested in the stock in which no right is lost due to termination or retirement. To plaintiff's argument that the plan

having a special rule for employees over 57 and younger than 60 give older employees benefits they would not have otherwise been entitled to following retirement or termination, defendant counters that the special rules is not designed to systematically defer income for retirement but for the forfeiture of unvested stock if the participant went to work for a competitor as did plaintiff.

The Court has carefully reviewed the restricted stock and stock option plan and agrees with defendant that the case of <u>Emmenegger v. Bull Moose Tube Co.</u>, 197 F.3d 929, 932-934 (8th Cir. 1999), provides the proper framework in evaluating this plan as follows:

> The plaintiffs contend, and the District Court held, that the PSP is a pension plan within the meaning of ERISA.  An employee pension benefit plan is defined by ERISA as "any plan, fund, or program ... to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program-(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond."  29 U.S.C. § 1002(2)(A) (1994).  The Company argues that, because the PSP does not condition redemption of PSP shares upon an employee's termination and because its purpose is not the deferral of income, it is not an ERISA plan but instead is properly characterized as a non-ERISA bonus program.  By regulation, the Secretary of Labor has specifically excluded bonus programs from the definition of an employee pension benefit plan under ERISA.  See 29 C.F.R. § 2510.3-2(c).  The regulation provides that "payments made by an employer to some or all of its employees as bonuses for work performed" will not come within the definition of an ERISA plan "unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees."  Upon examination of the record, and applying the law to the facts in this case, we hold that the PSP is not a pension plan within the meaning of ERISA, but an excepted bonus program.  [Footnote omitted.]

> ****

> Further, the shares, or more accurately the redemption thereof, cannot be characterized as "payments [that] are systematically deferred" to termination or "so as to provide retirement income."  29 C.F.R. § 2510.3-2(c).  This is true whether one looks to the express language of the PSP or to the circumstances surrounding the program.  It may be that the stock provides post-employment income for some eligible participants, especially if they do not opt to redeem their shares during their tenure with BMT.  Nevertheless, the PSP has allowed vested participants, such as the plaintiffs, at their option, to redeem their shares-for full redemption value- at any time since October 1993 and for any reason.  See <u>McKinsey v. Sentry Ins.</u>, 986 F.2d 401, 406 (10th Cir. 1993) ("The plan permits a sales representative to withdraw the vested portion of her/his allocations at any time during the course of her/his

employment; it does not provide for the systematic deferral of payment."). In this case, the record demonstrates that certain participants in the program redeemed shares while still employed by BMT, providing present income to those participants. There is no indication in the record that PSP redemptions were regularly deferred or that the program's purpose was to provide retirement income to the participants. Clearly, the PSP was designed with the hope that it would provide income to the participants, but it was not designed "systematically" to provide retirement income rather than present income.

Here, this plan specifically states that "the plan is not an 'employee benefit plan' as defined by the Employee Retirement Income Security Act of 1974; therefore, it is not subject to Title I or Title IV of that act. The plan is not qualfiied under Section 401(a) of the Internal Revenue Code of 1986, as amended." Furthermore, the special rules at p. 10 of the plan clearly are focused on situations where a participant was terminated for aggravated cause and participants that engage in competition within the designated three-year time period – as happened here when plaintiff went to work for a competitor of defendant. Therefore, this plan is simply not a pension plan under ERISA.

Accordingly, defendant's August 30th motion (#28) for summary judgment as supplemented on September 8th (#33) is hereby granted and the case is dismissed with prejudice. Defendant's October 21st motion (#51) to attach Exhibit A is granted. With this entry of summary judgment, the pending motions to compel (#23) and in limine (#42 and #45) are rendered moot.

IT IS SO ORDERED this 28th day of March, 2006.

UNITED STATES DISTRICT JUDGE